BEERS, executor of *Josiah Sanford, against* LYON.

The principal object of the statute of 1828, regarding assignments, was, to provide a responsible trustee to receive assigned property, and cause it to be equally distributed among the creditors of the assignor; and that statute should be liberally expounded so as to effect such object.

Where an absolute bill of sale, of hats and other personal property in a hatter's manufactory, was executed by *A* to *B*, his father, expressed to be, in consideration of 1500 dollars, received by the assignor, whereby he conveyed the estate under his hand and seal, and agreed to warrant and defend the title; at this time, *A* was in failing circumstances, and made the assign-

*Fairfield*,
June, 1852.

Beers, exr. of
Sanford.
*v.*
Lyon.

ment, with a view to his insolvency; but it also appeared, that no such consideration as that expressed was in fact paid or received; a note held by *B* against *A* was not given up, nor did *B* agree to pay another note, which he had signed jointly with *A ;* no definite valuation of the property conveyed, was agreed upon, by the parties, though there was evidence to show, that the object of the assignment was, to pay said notes from the proceeds of the property, and to pass the surplus into the hands of an assignee under a general assignment of the residue of *A's* property, then in contemplation, and shortly after made by him ; in an action by *B* against an attaching creditor of *A*, for taking the property assigned, it was held, 1. that *B* was a *trustee* of such property, first, for the payment of said notes, and then for the general creditors of *A ;* 2. that as the trust was not for the creditors equally in proportion to their respective claims, and was not in writing, the assignment was utterly void, as against the defendant, an attaching creditor of *A*.

Where it appeared, on the trial of such action, that though upon the assignment, the key of the shop in which the goods were, was delivered to *B*, yet it soon got back into *A's* hands, who was employed by *B*, to superintend the finishing of the hats, and fitting them for market; and all this was done at the shop where *A* had carried on his business, and *B* was not there more than three or four times between the assignment and the attachment, a period of eight days ; it was held, that the possession of the goods was never changed, but was substantially retained by *A ;* and on that ground also, the assignment made by *A* to *B* was void.

THIS was an action of trespass *de bonis asportatis*, for taking a quantity of hats and hat materials. The defendant pleaded the general issue, with notice that he should justify the taking, by virtue of writs of attachment, in favour of *Samuel B. Peck* and *William A. Parsons*, and also in favour of *William B. Glover*, against *Julius Sanford*, and the service of such writs, by him, the defendant, as a deputy sheriff.

The cause was tried, at *Fairfield*, *February* term, 1852.

There was much testimony on both sides, which was more or less conflicting. Among the facts which were either uncontroverted, or fully proved, were the following. On the 1st of *February*, 1849, the defendant, as deputy sheriff, took the goods specified in the declaration, by virtue of two writs of attachment, one in favour of *Peck* and *Parsons*, and the other in favour of *W. B. Glover*, against *Julius Sanford ;* the goods then being at a manufactory in which said *Julius* had carried on the business of manufacturing hats. On the 17th day of *January*, 1849, said *Julius* had made an assignment of the same goods to his father, *Josiah Sanford*, by an instrument of the following tenor :

" Know all men by these presents, that I, *Julius Sanford,* of *Newtown,* in the state of *Connecticut,* for the consideration of fifteen hundred dollars, received to my full satisfaction, of *Josiah Sanford* of said *Newtown,* have bargained and sold, conveyed and assigned, and by these presents, do grant, bargain, sell, assign and transfer to the said *Josiah Sanford,* the following articles of personal property, to wit, 6 dozen men's finished hats, &c., [specifying the goods now in question :] *To have and to hold* the aforesaid property, to him, the said *Josiah Sanford ;* and I do hereby agree to warrant and defend to the said *Josiah Sanford,* his heirs, executors, administrators, and assigns, said goods in consideration aforesaid, by these presents ; of which said goods I do hereby give possession to the said *Josiah Sanford.*

In witness whereof, I have hereunto set my hand and seal, this 17th day of *January,* 1849.

*Julius Sanford.*"   [ L. S.]

In presence of *Amos S. Treat.*

On the evening of the same day, *Julius Sanford* made a general assignment of the residue of his property to *Moses Parsons,* his father-in-law, to whom the keys of the shop were, at that time, delivered.

At the time of making the first-mentioned assignment, *Julius Sanford* was indebted to *Josiah Sanford,* by a note, dated *January* 8th, 1849, for the sum of 556 dollars, 99 cents, with interest. *Josiah Sanford* had also signed, jointly with *Julius,* a note, dated, *January* 2nd, 1846, to *Henry Beers,* for eight hundred dollars, with interest annually, on which the interest which had become due, had been regularly paid and indorsed ; which note was signed by *Josiah,* as surety for *Julius,* for money advanced, to enable him, *Julius,* to carry on the hatting business.

The cause turned on the validity of the assignment to *Josiah Sanford,* to which the testimony, on both sides, was principally directed. As the prominent features of such testimony are adverted to, in the opinion of the court, it will not be detailed here.

At the close of the evidence, on the trial, the defendant requested the court to charge the jury, that if the facts were as stated by the plaintiff and his witnesses, regarding the bill of sale, and the disposition to be made of the surplus, if there should be any, the bill of sale would be void, as against

*Fairfield,*
June, 1852.

Beers, exr. of
Sanford.
*v.*
Lyon.

the creditors of *Julius Sanford,* not being made in compliance with the statute law upon the subject of assignments made for the benefit of creditors. But the court did not so charge the jury.

The defendant further claimed, and asked the court to charge the jury, that if the plaintiff, after the bill of sale, employed the vendor to finish the hats for sale, and gave him the keys of the shop, and the charge of the property, and put him in possession of the property, in the manner and to the extent testified to, by the plaintiff and his witnesses, the property was liable to be attached, by the creditors of the vendor, as being transferred by a bill of sale, fraudulent and void, as against creditors. But the court did not so charge the jury.

But the court charged the jury, that to constitute, as against the creditors of the vendor, a legal and valid sale and a transfer of personal property, capable of being removed, there must be an actual change and delivery of possession thereof to the vendee, and without expectation or intention of its coming back again into the custody, controul, and possession of the vendor; that a formal change of possession was not sufficient; and that a want of such real change of possession and controul, was not satisfied, by proof that the sale was made upon valuable and adequate consideration. And that the question here for the jury was, whether there had been such a real change of possession, and whether *Julius* had the superintendence and management of the hats, or any possession distinct from his father. And if there had not been such a change of possession and controul, the sale was fraudulent in law and void, as to the creditors of *Julius.*

The plaintiff obtained a verdict; and the defendant thereupon moved for a new trial for the refusal of the court to charge as claimed by him, and also upon the ground that the verdict was manifestly against the evidence in the cause.

*Dutton* and *Belden,* in support of the motion, contended, 1. That the court should have charged the jury, that according to the plaintiff's own showing, the assignment was void as against creditors. According to the testimony both of the plaintiff and *Julius Sanford,* the surplus was to be

paid over to the general assignee. In the first place, the general assignment was not made till after they had been to the shop. Secondly, such an assignment, if bad in part, would be bad for the whole.

2. That *Josiah Sanford* would not be liable to account to *Julius* for the surplus. He would, therefore, hold it for himself, or for *Julius'* creditors. *Stat.* 363.

3. That such a conveyance must be good, when made, or not at all. It was not certain then, that a general assignment would be made.

4. That the conveyance stands on no better ground than if there had been no debt to be secured. A conveyance to *Josiah Sanford* of property, to be delivered to an assignee to be thereafter appointed, would be clearly bad, not only upon principles of the common law, but as contrary to the policy of the statute law. If there had been no general assignee appointed, the creditors would have been obliged to go into a court of chancery. If *Josiah Sanford* had not delivered over the property, the general assignee would have been obliged to do the same, or sue at law. This would delay creditors.

5. That the court should have charged the jury, that by the plaintiff's own showing, the conveyance was void, as to creditors. Both the parties to the conveyance, *Josiah* and *Julius Sanford*, say, that *Josiah* employed *Julius* to finish up the hats, and that *Julius* had the keys, at the time of the assignment. This, of course, left *Julius* in possession. Secondly, the circumstances, as proved by the plaintiff's witnesses, are at least as strong as in *Peck* v. *Whiting*, *ante*, 206., where the court granted a new trial for a charge like the present. Thirdly, *Julius* swears that he had the general superintendence. This is all that is meant by possession. Fourthly, if the vendee can employ the vendor as agent, and the question is then to be left to the jury, whether this puts the vendor in possession ; the rule amounts to nothing. Fifthly, the case, on the plaintiff's testimony, shows, at least, a joint possession. The authorities are decisive, that such a possession renders the conveyance void, as against creditors. *Wardell* v. *Smith*, 2 *Campb. Cas.* 202. Sixthly, the point has been repeatedly ruled, in substance at least, as claimed by the defendant. *Peck* v. *Whi-*

*ting*, 21 *Conn. R.* 206. *Bishop* v. *Warner*, 19 *Conn. R.* 460. *Carter* v. *Watkins*, 14 *Conn. R.* 220. *Osborne* v. *Tuller*, 14 *Conn. R.* 529. *Kirtland* v. *Snow*, 20 *Conn. R.* 23. In *Peck* v. *Whiting*, and *Kirtland* v. *Snow*, the point was decided as a question of law.

6. That the verdict is against the evidence in the whole cause. In the first place, this appears in all the particulars already specified. Secondly, there is no conflicting testimony as to the possession. The question is therefore really a question of law. Thirdly, if a verdict, under such circumstances, can be sustained, a vendor may always be employed to sell or work up the property. A nominal possession, by a vendee, would, in nine cases out of ten, satisfy a jury.

*Hawley* and *Treat*, contra, contended, 1. That the bill of sale was not void, as claimed by the defendant. It was not an assignment or conveyance within the statute. *Stat.* 363. § 1. *Bates* v. *Coe*, 10 *Conn. R.* 280. Its sole object was, to secure the *payment* of the liabilities of the vendor, not to third parties, but to the vendee. The provision regarding the surplus, was merely incidental. An action at law would have compelled the vendee, without any promise, to do the very thing he promised. *Northrop's* exrs. v. *Graves*, 19 *Conn. R.* 548. 1 *Sw. Dig.* 398. *Hall* v. *Marston*, 17 *Mass. R.* 575. *Claflin* v. *Godfrey*, 21 *Pick.* 1. And surely honesty and equity here follow the law. *St. John* v. *Camp*, 17 *Conn. R.* 222.

2. That there was no error in the refusal of the court to charge the jury, as claimed by defendant. The first question was one of *fact*,—whether the vendor or vendee had the legal possession and apparent ownership of the goods, and was, of course, for the jury, and not the court, to decide. The charge, as given, was unexceptionable. *Avery* v. *Clemens*, 18 *Conn. R.* 309. *Kirtland* v. *Snow*, 20 *Conn. R.* 52.

3. That the verdict was not against the evidence, but is fully sustained by it. The sale and change of possession were open and notorious in the neighbourhood. *Mills* v. *Camp*, 14 *Conn. R.* 225. The process of manufacturing, before largely carried on, was, and from the transfer had

been, notoriously and wholly discontinued. The presence of *Julius* in the shop, as proved, was as the mere agent of, and mainly in company with, his father, and was unaccompanied with a single sign of apparent ownership in *Julius,* and did not, and could not, give him false credit. *Julius* had no possession or controul "distinct from his father." *Ludlow* v. *Hurd,* 19 *Johns. R.* 222. *Allen* v. *Egerton,* 3 *Term R.* 442.

HINMAN, J. The defendant, a deputy sheriff, had writs of attachment in his hands, against *Julius Sanford,* and he attached, as said *Sanford's* property, the goods in question. They consisted of hats, and hatting materials, and were found by the officer, at the manufactory where said *Julius* had been engaged in manufacturing hats : they were claimed however, by *Josiah Sanford,* the father of *Julius,* under an assignment made a few days previous to the attachment ; and the question is, whether he can hold them against the attaching creditors of his son.

One point in the case is, whether *Josiah Sanford's* assignment from his son, was not void, under the statute in reference to the assignment of property, by persons in failing circumstances, passed in 1828. That statute enacts, that all " assignments of any lands, tenements, goods, chattels, or choses in action, made, directly or indirectly, by any person, in failing circumstances, with a view to his insolvency, to any person or persons, in trust for his creditors, or any of them, shall, as against the creditors of the person making such conveyance or assignment, be deemed and adjudged fraudulent and utterly void, unless the same shall be made in writing, for the benefit of all said creditors, in proportion to their respective claims, and be lodged for record, &c." *Stat. p.* 363. The principal object of this statute undoubtedly was, as was said in the case of *Bates* v. *Coe,* 10 *Conn. R.* 280. to provide a responsible trustee, to receive assigned property, and cause it to be equally distributed among the creditors of the assignor. The law became necessary, because under the old system, assignments were frequently made to the confidential friends or connexions of the assignor, and the property kept, by the trustees, sometimes for their own personal use, but more generally for the

use of the assignor; and hence it became a convenient way in which debtors in failing circumstances, were enabled to place their property out of the reach of attaching creditors, and at the same time, use it for their own purposes. The difficulty of making even responsible trustees account to the creditors, was so great as usually to prevent their attempting it; and it was, of course, never attempted, in the more common case, where the trustees were not responsible. It was, then, a statute made to prevent fraudulent conveyances; and hence it was passed as an " addition" to the act against such conveyances, as is shown by its title. Statutes of this description, we are told, should be liberally expounded so as, if possible, to answer the design of the legislature. With this principle in view, let us look at this assignment, and at the circumstances attending it, to see if, under this statute, it can be supported.

In the first place, it is not denied, that the bill of sale from *Julius Sanford* to his father, is embraced within the language of the statute. It is both a *conveyance* and an *assignment* of property. It is absolute, unconditional, formal, and precise in its terms—and for the consideration of 1500 dollars, which the assignor acknowledges he has received, it conveys the property, professes to deliver to the assignee the possession of it, and agrees to warrant and defend the title. And although a conveyance of personal property merely, yet it is executed under seal; and thus, in every particular, is about as solemn an instrument as could well be made—quite as solemn as we have ever seen made, for the purpose of conveying a few boxes of hats, some furs, and paper, and a few shop fixtures.

In the next place, the conveyance was made " by a person in failing circumstances, with a view to his insolvency." This is abundantly shown by the proof. On the same day, and very soon after this conveyance, he made a general assignment of all his other property, excepting only such as was not liable to be taken on execution; and on the settlement of this estate, his creditors generally were paid only 24 cents on the dollar of their claims; and the plaintiff's witnesses testify, that when the sale to him was made, the general assignment was in contemplation. Indeed, it is a part of the plaintiff's case, which his proof supports most

fully, that a contemplated surplus of the property conveyed to the plaintiff, over the amount of his own debt and the debt due Mr. *Beers*, was to be paid over to the general assignee. With all this evidence, it would not do to deny, and the plaintiff does not deny, either the contemplated insolvency of the assignor, or that the conveyance was made with a view to such insolvency.

The question then remains, whether the conveyance was an absolute sale for money, as it purports to have been ; or whether it was, either in whole or in part, a conveyance in trust for his creditors, or any of them. If the former, it was a valid conveyance ; but if the latter position is true, then it must be admitted to be invalid, or, as the statute has it, " utterly void," as against his creditors. Now, it is worthy of observation, that this conveyance did not set forth the true contract between these parties. It can hardly be presumed, that it was intended for any such purpose. Why the parties preferred to take this course, we do not know. A jury might infer, that it was done because they supposed the truth would not answer their purposes ; but we have nothing to do with that, in this part of the case. We only allude to it here, for the purpose of showing, that we are driven to look to the other evidence in the case, in order to determine the true nature of the contract, and thus to find whether this was an absolute sale, or a conveyance in trust.

What then was the real contract, which the instrument should have shown, and which the parties intended to carry out ? We have seen what was the condition of the assignor,—that he was on the eve of insolvency. He owed his father a note of 556 dollars, and Mr. *Beers* another of 800 dollars, which his father had signed with him, as surety ; and he owed other creditors to a much greater amount than the whole value of his estate. He wished to secure his father ; and if that was all, nothing was easier than to have made him a mortgage, and let him take possession under it. They, however, did not choose this course, but chose rather that an absolute bill of sale, for the consideration, as it says, of 1500 dollars, received of the vendee, should be given, when in fact no such consideration was given. Nor, indeed, was there any consideration at all for such a conveyance as this. The plaintiff's note was not given up ; it was not

treated as paid, by the conveyance ; and they did not so consider it.   Nor did the vendee agree with his son to pay the *Beers* note.   The father's liability to *Beers* and his own note would have been a good consideration for a mortgage ; or, had he given up his own note as satisfied, and agreed with his son to pay the *Beers* debt, this would have been a consideration for an absolute conveyance of property to the amount of nearly 1500 dollars.   But he carefully avoids taking a mortgage, and as carefully treating his debt as paid, and agreeing to pay *Beers*.

Again, the goods were not valued at 1500 dollars, or, indeed at any sum, excepting only as that in an ideal valuation put into the instrument, for the purpose of showing on paper, a consideration for the sale.   On the contrary, the father and both his sons, *Julius* and *Henry*, say, that when the bill of sale was given, *Julius* spoke of the worth of the goods, as they named them ; but the vendee did not agree with him, and was not willing to take them at his price ; but he did take them, and agree to hand over the balance to the general assignee.   And this was done, in order to avoid any difficulty in regard to the price.   *Henry's* explanation of it is, that his father only wanted his pay for the two notes.   He says, the goods were assigned to pay those notes ; and that the notes were to be paid out of the proceeds of the property, as soon as his father could sell it.   This is probably the true exposition of the agreement.   The plaintiff's witnesses, who speak on the subject, all agree in this substantially ; and there is nothing to conflict with it.

Upon the plaintiff's own showing, then, he takes the goods, without any price being fixed which he is to allow for them ; he is to sell them, and out of the proceeds pay himself his own note ; then, Mr. *Beers'* note, on which he is liable as surety ; and he is to pay over the balance, if there be any, to the general assignee.   We think this made him a trustee of these goods for the benefit of Mr. *Beers*, in the first place, and then as to the surplus, for the benefit of the creditors generally, through the trustee of property thereafter to be assigned for their benefit, and the assignment of which, the witnesses tell us, the parties contemplated.

A trust is an obligation arising out of a confidence re-

*Fairfield,*
June, 1852.

Beers, exr. of
Sanford.
*v.*
Lyon.

posed in the trustee, or person who has the legal title to property conveyed to him, that he will faithfully apply the property according to the confidence reposed; in other words, according to the wishes of the creator of the trust. This is the technical definition of a trust. 4 *Kent's Com.* 304. & seq. There is no mystery in the idea of a trust. In a certain sense, a mere bailee or agent is a trustee; because he has property delivered to him, in the confidence that he will do with it according as he is directed by the bailor; but the word is not used in the statute in this sense. The statute requires, that the property must be conveyed to the trustee. He must take the title: until he takes the title, it remains the property of the bailor, and is liable to attachment for his debts. But where property is conveyed to another, in confidence that he will sell and apply the avails in a particular way, not for his own use, this, it would seem, must be a trust, if anything can be. Suppose the parties, instead of the instrument which they did execute, had reduced their real agreement to writing, what would have been its language? Could it have been anything else than this, in substance? In consideration that I am indebted to my father, in a note, and to Mr. *Beers* in another note, and to divers other creditors for whose benefit I contemplate assigning the balance of my estate,—I do sell and assign to my father the property, in trust, that he will sell and convert the same into money, and out of the avails pay his own note and also the said note of Mr. *Beers;* and in further trust, that the balance of said avails, if any remains after paying said two notes, he will pay over to such assignee as I shall hereafter appoint of my other property, to be applied by him as I shall direct in said assignment hereafter to be made. Could any one doubt that such an instrument would create a trust? Would any lawyer hesitate to factorize the vendee, as the trustee of *Beers,* irrespective of his indebtedness on the note itself? We think not. And we therefore hold, that this property was conveyed to *Josiah Sanford in trust;* and as it was not a trust for all the creditors equally in proportion to their respective claims; and moreover, was not in writing, and had none of the requisites of a legal trust under the statute, we hold it to be utterly void, as against the defendant, an attaching officer for creditors.

The point which we have been considering, seems to dispose of the case. A new trial must be granted, and on a ground, which, it would seem, must always prevent a recovery on the part of the plaintiff. Still we think a new trial should also be granted, on the ground that the possession of these goods was never changed, but *Julius Sanford*, the assignor, did always retain the possession of them, substantially. We know, that the witnesses testified, that the key of the shop in which the goods were, was delivered to the father; but it very soon got back into the son's hands; and when the officer attached, the son not only had the key of the shop, but he was employed, by his father, to superintend the finishing up of the hats, and boxing them up for market. He says himself, that he was to arrange the things, in a proper manner, to be disposed of; that he only had charge of the property, as an agent; that he had the superintendence of getting up the hats; that he had the general superintendence under his father, and helped put the hats in order to be sold. Now, when we consider, that this was all done at the shop, where the assignor had carried on his business; that his father was not, or does not appear to have been, there, more than three or four times between the day of the assignment and the attachment, a period of about eight days; we think the case comes directly within the principle of all our late cases on this subject; and as we have said, in some of those cases, so we say in this, there was just about evidence enough of a change in the possession to satisfy an intelligent mind, that it was intended as a colourable, and not as a real, change. *Kirtland* v. *Snow*, 20 *Conn. R.* 23. *Peck* v. *Whiting*, 21 *Conn. R.* 206. and the cases therein cited.

We therefore advise a new trial, on both the grounds indicated.

In this opinion the other judges concurred, except CHURCH, Ch. J., who was disqualified under the late statute, and ELLSWORTH, J., who dissented.

New trial granted.